2022 UT App 110

# THE UTAH COURT OF APPEALS

MARIE BINGHAM,
Petitioner,

*v.*

DEPARTMENT OF WORKFORCE SERVICES,
Respondent.

Opinion
No. 20210763-CA
Filed September 9, 2022

Original Proceeding in this Court

Marie Bingham, Petitioner Pro Se

Robert D. Andreasen, Attorney for Respondent

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

ORME, Judge:

¶1 Marie Bingham seeks judicial review of the decision by the Appeals Board (the Board) of the Department of Workforce Services (the Department) affirming the decision of the Department's Administrative Law Judge (the ALJ). The ALJ's decision reversed the Department's denial of all unemployment benefits for Bingham. The ALJ ruled that Bingham was entitled to a portion of those benefits by reason of disruptions attributable to the COVID-19 pandemic that were beyond her control. But the ALJ affirmed the denial of benefits during a time when Bingham avoided work out of concern that she was not yet vaccinated against COVID-19. We decline to disturb the Board's decision.

BACKGROUND

¶2    Bingham worked as a part-time sales lead at a women's clothing store (Employer) until March 2020, when the COVID-19 pandemic forced Employer to close its doors and to furlough Bingham. In response, Bingham opened a claim for unemployment insurance benefits with the Department. Once she opened her claim, Bingham was provided with a claimant guide that informed her that she would "be held responsible for knowing the information in this guide." The guide also instructed that to receive benefits, Bingham was "required to be able and available for full-time work."

¶3    In August 2020, Employer reopened for business and requested that Bingham return to work. Bingham worked two four-hour shifts and temporarily stopped filing for unemployment benefits, but Employer was again forced to furlough her due to a lack of customers and the resulting decrease in staffing needs.

¶4    Bingham then reopened her claim for unemployment benefits with the Department. The Department again sent her the claimant guide that informed her that to obtain these benefits, she "must be able and available to accept full-time work." And when filing her weekly claim in early December, Bingham acknowledged receiving the claimant guide.

¶5    From August 2020 until January 2021, Bingham regularly contacted Employer to inquire if work shifts were available for her, but none were, and Bingham continued filing for and receiving weekly unemployment benefits during this time.

¶6    During the last week of January 2021, one of Employer's managers called and "asked if [Bingham] would work a few hours for an associate" who had to miss work. Because the shift was only for four hours, and due to the heightened danger COVID-19

presented to Bingham given her advanced age, she and the manager "mutually agreed" that because she would soon be able to obtain the COVID-19 vaccine, "it might not be a great idea for such a few hours to be back in there in a danger[ous] situation." Thus, she did not cover the shift. When later asked at a hearing before the ALJ if she could have gone in to cover the shift, Bingham responded that she "preferred not to."

¶7    In February, Employer offered another shift to Bingham, but Bingham again declined because she still had not received the vaccine, which she was scheduled to get on March 13, 2021. Again, as Bingham later testified, she and Employer "discussed the fact that I was 79 years of age and had not yet been vaccinated, . . . and we mutually considered it to be too dangerous for me to return to work until I was fully vaccinated." After this call, Employer placed Bingham on "a non-medical personal leave of absence"[1] until the end of May 2021. Bingham returned to work on June 5, 2021, when she was "fully vaccinated."

---

1. Given the relative consensus of science at the time, Bingham's age—which put her just behind "healthcare personnel" and those admitted to long-term care facilities in terms of vaccination priority, with the CDC recommending vaccination for people 65 and older before full re-entry into everyday life—it is unclear why Employer considered the leave of absence to be "non-medical." *See* Cory Stieg, *When Dr. Fauci and Other Experts Say You Can Expect to Get Vaccinated for Covid-19*, CNBC (Dec. 14, 2020), https://www.cnbc.com/2020/12/14/who-gets-the-covid-vaccine-first-timeline-and-priority-explained.html [https://perma.cc/7NAJ-JG5J] (reporting that in December 2020, "healthcare personnel" would be first in line to receive the vaccine, followed by those admitted to long-term care facilities, and that those "65 and older are also recommended to get the vaccine early if supplies are limited"). *See also COVID-19 Risks and*

(continued…)

¶8 Bingham continued to file weekly claims for unemployment benefits with the Department until May 15. When filing her weekly claim for the last week of January 2021, Bingham responded "No" when asked if she had "refuse[d] an offer of work." And on every weekly claim she filed through May 15, she was asked, "Were you able and available for full-time work without any restrictions?" Each time Bingham answered, "Yes." In April 2021, Employer responded to an inquiry from the Department about Bingham's work status. Employer stated that Bingham "is currently on an approved leave of absence."[2] In total,

---

*Vaccine Information for Older Adults*, Centers for Disease Control & Prevention (Aug. 4, 2021), cdc.gov/aging/covid19/covid19-older-adults.html [https://perma.cc/QVP8-YMDG] (explaining that "[o]lder adults are more likely to get very sick from COVID-19" and should "[g]et vaccinated as soon as possible" to "resume activities that [they] did prior to the pandemic").

2. The parties have not detailed, nor is it apparent from the record, what the exact particulars of this leave of absence were. It is clear that in February, however, Employer placed Bingham on "a non-medical personal leave of absence" until the end of May, when she was expected to be "fully vaccinated." Thus, Employer held Bingham's job open for her to return to but was likely not providing monetary benefits to her, given that she was claiming unemployment benefits each week during this period. This is in line with the common understanding of what constitutes a leave of absence. *See Reagan Outdoor Advert., Inc. v. Lundgren*, 692 P.2d 776, 778 (Utah 1984) ("Two elements of a leave of absence that distinguish it from a termination of employment are permission to leave work and an intent to return."); *Cooper Valves, LLC v. ValvTechnologies, Inc.*, 531 S.W.3d 254, 264 (Tex. Ct. App. 2017) ("A leave of absence is not a complete separation from employment and connotes a continuity of the employment status.") (quotation simplified); *Leave of absence*, Black's Law Dictionary (11th ed. 2019)

(continued…)

from September 6, 2020, until May 15, 2021, Bingham received $12,426 in unemployment benefits.

¶9     In reviewing Bingham's case in June 2021, the Department determined that Bingham voluntarily "quit for personal reasons" and "failed to show good cause in quitting." The Department then denied unemployment benefits to Bingham under Utah Code section 35A-4-405(1) from September 2020 through May 2021, and after determining under Utah Code section 35A-4-406(4) that the fault lay with Bingham for receiving $12,426 in benefits that she was not entitled to, it required her to remit the full amount.

¶10     Bingham appealed this decision to the ALJ. A telephonic hearing was subsequently held in which Bingham participated with the help of an "Informal Representative."[3] At the hearing, the

---

(defining leave of absence as "[a] worker's temporary absence from employment or duty with the intention to return").

3. The Department's website explains representation at hearings before an ALJ as follows:

> Most parties at the hearing represent themselves. The Administrative Law Judge (ALJ) will explain the hearing process, question the parties or witnesses, and help you ask questions if needed. You have the right to be represented by any person at your own expense. The person does not need to be a lawyer.
>
> If you choose to hire a representative, contact your representative immediately to give that person time to prepare for the hearing. It is your responsibility to notify your representative of the time of the hearing and to pay any fees charged to you. (Non-Attorneys representing claimants may

(continued…)

Department presented numerous exhibits to prove its case, including voicemails, emails, summaries of phone calls, and notes. The ALJ accepted the exhibits after Bingham's representative stated that he had no objections. During the hearing, Bingham testified consistent with the facts laid out above, and her representative was allowed to ask questions and make a final statement.

¶11 During the telephonic hearing, Bingham's representative informed the ALJ that Bingham has difficulty hearing and that "she can hear better if . . . you're not talking on speaker phone." A few moments later, the following exchange between the ALJ and Bingham took place:

> [The ALJ]: I understand that there might be some times where you wouldn't be able to hear me. Are you having any trouble hearing me now?
>
> [Bingham]: I'm okay . . . it's understanding. I hear, it's the understanding. [Y]ou did go fast but that's okay. I think I got pretty much all of it so . . . I think I'm ok at the moment, yes.
>
> [The ALJ]: Alright, so Ms. Bingham with that in mind, will you be sure to stop me and tell me if there is something that you don't understand or if you need me to repeat it?
>
> [Bingham]: Oh, Your Honor, I appreciate that. Thank you.

---

NOT bill for their services without the ALJ's prior approval of their fees).

*Guide to the Unemployment Insurance Appeals Process*, Department of Workforce Services, https://jobs.utah.gov/appeals/appeals pamphlet.html#attorney [https://perma.cc/NC2Q-9YP7].

> [The ALJ]: So you can feel free to interrupt me at any time during the hearing and tell me, please repeat that, or could you ask that question again, or could you re-explain something, alright?
>
> [Bingham]: It's so kind of you, thank you.

¶12 Following the hearing, the ALJ partially reversed the Department's decision. He determined that Bingham was eligible for benefits from September 6, 2020, until January 23, 2021, because her unemployment then was due to a workforce reduction by Employer and not due to Bingham voluntarily quitting. The ALJ ruled, however, that Bingham was not entitled to benefits under Utah Code section 35A-4-403(1)(c) for the period of January 24, 2021, through May 15, 2021, because Bingham "was not able or available for full-time employment." This corresponded to the period beginning with the "mutual" decision that Bingham not take the first fill-in shift she was offered and that she not return to work until she was fully vaccinated. The ALJ then reduced the amount Bingham was required to remit from $12,426 to $8,608—which was the amount she received for the period of January 24 through May 15—and concluded that Bingham was at fault for the overpayment for three reasons. First, the Department had provided her "with instructions to report if she had declined any offers of work," which she did not do. Second, Bingham had also been instructed "to report if she was not able or available for full-time employment," which she did not do. And third, "the Department's online filing application directly asked [Bingham] if she had refused work and if she was able and available for full-time employment," which she did not truthfully answer. Based on these findings, the ALJ determined that Bingham "should have known to report she refused an offer to return to work or that she was not able and available for full-time employment."

¶13    After the ALJ issued his decision, Bingham moved to supplement her testimony with a declaration. She contended that she has "a hearing impediment" and "may . . . not have heard and thus not have understood the significance of [the ALJ's] questions" and that she "may not have had the ability to provide a complete and accurate response." In an attached affidavit, Bingham averred, "On all my applications requesting unemployment compensation I always reported I was able and available for full-time work." She also stated:

> But for lack of a Covid vaccination I was always able and available to continue my work [for Employer] when my supervisor scheduled me for work. Even while I was waiting to be vaccinat[ed], . . . I consistently called my supervisor . . . to determine when I should next come to work. In each instance[] my supervisor told me because of the reduced customer load due to Covid and the fact I was unvaccinated they did not have sufficient hours for me. . . . Consequently, the company gave me a leave of absence until I was vaccinated.

¶14    The Board determined that Bingham's motion and affidavit was an appeal of the ALJ's decision and, after granting an extension, gave Bingham time to submit written arguments. Bingham then moved to exclude certain exhibits admitted in the hearing before the ALJ on hearsay and authentication grounds.

¶15    The Board issued a decision on September 22, adopting the ALJ's factual findings and affirming his decision. Specifically, it ruled:

> When [Bingham] refused to return to work, she made it clear she would not make herself available to work until she had been fully vaccinated. Further, [Bingham] went on a leave of absence in order to

give her time to go through the vaccine regimen.
The Employer held [her] job open for her until she
was able to receive all of her shots. The record shows
[Bingham] restricted her availability and was also
filing for benefits while on a temporary leave of
absence. Under the rules, she was not able and
available for full-time work. Benefits are denied
from January 24, 2021, until she returned to work on
June 5, 2021.[4]

¶16 In assigning fault for the overpayment of benefits, the
Board found that all three elements under the applicable
administrative rules were present, namely, knowledge,
materiality, and control. It found that Bingham had the requisite
knowledge because she had received the claimant guide, which
instructed her "about the necessity of reporting refusal of work
and also about the requirement that claimants be able and
available for full-time work." The Board found that Bingham also
"failed to report in her weekly filings that she had a condition that
prevented her from accepting full-time work; namely, that her
vaccination status was an impediment to her availability for
work." It next determined that materiality was established
because she was paid benefits that she was not entitled to and that
control was established because Bingham "could have provided
the relevant information" to the Department.

¶17 Three weeks later, on October 12, Bingham moved for the
Board to amend or reconsider its decision. In that motion, she
claimed that her representative had mailed a memorandum in
support of her appeal of the ALJ's decision to the Board within the
time allotted and that shortly after mailing it, he left the country
on vacation. When he returned on October 11, well after the
deadline and after the Board had issued its decision, he found the

---

4. Although Bingham returned to work on June 5, 2021, she
received benefits only from January 24, 2021, to May 15, 2021.

memorandum had been returned to him by the post office. Bingham therefore urged the Board to reconsider its decision in light of her missing memorandum, and she provided the Board with a copy of her wayward memorandum.

¶18 The Board denied Bingham's request, noting that parties are "responsible for ensuring their Board and court filings are timely submitted and received by the reviewing body by the given deadlines" and that Bingham's "filing was delivered well after the Board's decision had already been issued." Bingham moved a second time for the Board to reconsider its decision, essentially making the same arguments she made in her previous motion. The Board again denied Bingham's request.

¶19 Bingham seeks judicial review of the Board's decision.

### ISSUES AND STANDARDS OF REVIEW

¶20 Bingham raises three issues that merit our consideration. First, she argues that she should have been granted unemployment benefits from January 24, 2021, through May 15, 2021.[5] Second, Bingham argues that she should not have been assigned fault for the overpayment and should not have been required to remit the benefits she incorrectly received.

¶21 These two issues trigger a layered standard of review. "We review the Board's application or interpretation of a statute as a question of law under the correction-of-error standard." *Martin v. Department of Workforce Services*, 2022 UT App 32, ¶ 2, 507 P.3d 847

---

5. Bingham endeavors to raise further issues regarding the Board's denial of her unemployment benefits. But these additional issues go to the Board's ultimate decision to deny the benefits, and we decline to recite them here. Instead, we consider them with our analysis of the Board's ultimate denial of benefits.

(per curiam) (quotation simplified). "However, if the Board has correctly interpreted the applicable statutes, the Board's ultimate decision to grant or deny benefits is entitled to deference because it involves a mixed question of law and fact that is fact-intensive and therefore does not lend itself to consistent resolution by a uniform body of appellate precedent." *Id.* (quotation simplified). Additionally, "we will not disturb the agency's interpretation or application of one of the agency's rules unless its determination exceeds the bounds of reasonableness and rationality." *Ernest Health, Inc. v. Labor Comm'n*, 2016 UT App 48, ¶ 6, 369 P.3d 462 (quotation simplified). And finally, "when a petitioner challenges an agency's findings of fact, we are required to uphold the findings if they are supported by substantial evidence when viewed in light of the whole record before the court." *VanLeeuwen v. Industrial Comm'n*, 901 P.2d 281, 284 (Utah Ct. App. 1995) (quotation simplified).

¶22    Bingham's third issue is subject to a different standard of review. She contends that the ALJ violated her due process rights in several ways. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *Salt Lake City Corp. v. Jordan River Restoration Network*, 2012 UT 84, ¶ 47, 299 P.3d 990 (quotation simplified).

ANALYSIS

I. Eligibility for Unemployment Benefits

¶23    Bingham contends that she is entitled to unemployment benefits from January 24, 2021, to May 15, 2021. To be eligible for unemployment benefits, an individual must be "able to work and . . . available for work during each and every week for which the

individual made a claim for benefits."[6] Utah Code Ann. § 35A-4-403(1)(c) (LexisNexis 2019).

---

6. Citing Utah Code section 63-46b-16(4)(h)(iii), Bingham also contends that the Board "erred by making an inconsistent decision prohibited by" Utah law. But this section of the code is no longer in effect. It appears that Bingham intended to cite Utah Code section 63G-4-403(4)(h)(iii), which provides that on judicial review, this court "shall grant relief only if . . . it determines that a person seeking judicial review has been substantially prejudiced by" an agency action that is "contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency." *See* Utah Code Ann. § 63G-4-403(4)(h)(iii) (LexisNexis 2019). To prevail under a claim that an agency acted contrary to prior practice, the petitioner must identify prior agency cases with similar facts to their own case but with different outcomes. *See Taylor v. Department of Com.*, 952 P.2d 1090, 1094–95 (Utah Ct. App. 1998).

Here, Bingham does not direct us to any other cases with similar facts in which the Board reached a different decision. Rather, she attempts to show that the Board was inconsistent with its treatment of her case, because it determined she was eligible to receive benefits from September 6, 2020, to January 23, 2021, but that she was not eligible to receive benefits from January 24, 2021, to May 15, 2021. This is not how a claimant establishes that an agency acted contrary to prior practice. *See id.* But even if we agreed with Bingham that under the statute she could show inconsistency within her own case, her argument would still be unavailing because the facts of this case provide a "fair and rational basis for the inconsistency." *See* Utah Code Ann. § 63G-4-403(4)(h)(iii).

Because Employer furloughed Bingham, from September 6, 2020, to January 23, 2021, she was able to work and available to

(continued…)

¶24 To be considered able to work, an individual must have "no physical or mental health limitation which would preclude immediate acceptance of full-time work." Utah Admin. Code R994-403-111c(1). The rules also provide:

> A claimant is not eligible for benefits if the claimant is not able to work at his or her regular job due to a temporary disability and the employer has agreed to allow the claimant to return to the job when he or she is able to work. In this case, the claimant's unemployment is due to an inability to work rather than lack of available work. The claimant is not eligible for benefits even if there is other work the claimant is capable of performing with the disability.

*Id.* R994-403-111c(3)(a).

¶25 Here, Bingham's case fits squarely within the ineligibility for benefits laid out by statute and the administrative rules. Specifically, Bingham was not able to work or available to work due to her own decision, albeit a decision made in consultation with Employer and with the agreement of Employer. Bingham testified that she twice consulted her supervisors in the January-February timeframes when offered shifts and that both times they came to a "mutual agreement" that because she was

---

work but was not working due to the lack of available shifts. There was no testimony that Bingham declined to work due to her unvaccinated status during this period. But Bingham testified that from January 24, 2021, to May 15, 2021, she was unable and unavailable to work because she thought it was too dangerous to return to work while unvaccinated, thus changing her eligibility status for unemployment benefits. These are distinct facts distinguishing the time periods Bingham cites, and thus there was a fair and rational basis for any apparent inconsistency. *See id.*

then unvaccinated, it would not be wise for her to work. And Bingham told the ALJ that the reason she did not take the shift was because she "preferred not to." At the end of the second call with Employer, Bingham was placed on a leave of absence until she was fully vaccinated.

¶26 While this was inarguably a prudent course of action given her age and the ongoing pandemic, unfortunately in the context of unemployment benefits, it is fatal to Bingham's case. *See generally York v. Morgan*, 517 P.2d 301, 302 (Or. Ct. App. 1973) ("Unemployment compensation is designed to ease the burden of those who are generally available in the labor market but for whom no suitable gainful employment is available. It was not created to ease the burden of those who for one reason or another are not generally available."). These facts clearly establish that she was not "able to work and . . . available for work" because she agreed with Employer that she would not work until she was fully vaccinated, and consequently she was ineligible for benefits. *See* Utah Code Ann. § 35A-4-403(1)(c). *See also Arnold v. Department of Workforce Services*, 2021 UT 27, ¶ 18, 491 P.3d 957 ("For example, if the claimant is unable to work due to a temporary disability and the employer has agreed to allow the claimant to return to the job when able, the claimant is not eligible for benefits. So although unemployment may be due to circumstances beyond the control of the claimant, a claimant does not qualify for unemployment benefits unless able and available to accept immediate work.") (quotation simplified). Additionally, rule R994-403-111c(3)(a) of the Utah Administrative Code directs that individuals are not eligible for benefits when they are not able to work "due to a temporary disability and the employer has agreed to allow the claimant to return to the job when he or she is able to work." And here Bingham was not able to work due to her unvaccinated status, and Employer agreed to allow her to return when that status changed. Finally, given that Bingham would not return to work until she was fully vaccinated in June, she was not available

to work from January 25 to May 15 because her understandable position "preclude[d] immediate acceptance of full-time work." *See* Utah Admin. Code R994-403-111c(1).

¶27 Bingham resists this conclusion, contending that the Board lacked substantial evidence to find that she "was the one apprehensive about Covid-19 exposure" while at work, arguing that it was the manager's decision—not hers—to place her on a leave of absence. We disagree. Bingham's testimony provided the Board with substantial evidence that this was not solely Employer's decision.

¶28 With respect to the January phone call, Bingham testified, "I conveyed at that time[,] and we mutually discussed that, because it's a few hours and now it's the end of January and a vaccine is readily available and we both discussed . . . that it might be not a great idea for such a few hours to be back in there in . . . danger" and "we mutually agreed so I did not go in and help." And this was not the only time Bingham told the ALJ that it was a mutual decision for her not to return to work until she was fully vaccinated. In all, Bingham used the word "mutual" or "mutually" ten times when describing the discussions that led to her leave of absence. Thus, contrary to Bingham's current position that this was all at the behest of Employer, her own testimony before the ALJ clearly established that she, too, was concerned about returning to work and that it was a "mutual" decision to not return until she was fully vaccinated. Bingham cannot now claim otherwise in the face of her testimony in the record.

¶29 Therefore, we see no error in the way the Board interpreted Utah Code section 35A-4-403, and we discern no abuse of discretion by the Board in concluding that, under the facts of this case, Bingham was ineligible for unemployment benefits from

January 24 to May 15.[7] *See Martin v. Department of Workforce Services*, 2022 UT App 32, ¶ 2, 507 P.3d 847 (per curiam) ("The Board's ultimate decision to grant or deny benefits is entitled to deference[.]") (quotation simplified). Likewise, the Board did not "exceed[] the bounds of reasonableness and rationality" in interpreting and applying the applicable administrative rules in coming to the conclusion that Bingham was not eligible for benefits. *See Ernest Health, Inc. v. Labor Comm'n*, 2016 UT App 48, ¶ 6, 369 P.3d 462 (quotation simplified).

¶30　Citing Utah Code section 35A-4-405(1)(b), Bingham nonetheless claims that the Board's denial of benefits was "contrary to equity and good conscience." That section provides: "A claimant may not be denied eligibility for benefits if the claimant leaves work under circumstances where it would be contrary to equity and good conscience to impose a disqualification." Utah Code Ann. § 35A-4-405(1)(b) (LexisNexis 2019). The Department responds that this statute is inapplicable to Bingham's case because it only "applies in circumstances where a claimant has experienced a job separation caused by the claimant's decision to voluntarily quit." But here, Employer "held her job open for her until she was able to return to work." To support this contention, the Department cites rule

---

7. Bingham also contends that the Board erred "in finding I was ineligible for benefits from January 24, 2021 through June 5, 2021 based on a refusal to work claim where the finding[] is not supported by substantial evidence." She also contends that "the Board's conclusion that I should have accepted the one day four hour shift offered by [Employer was] arbitrary, capricious, and unreasonable." Because we affirm the Board's decision that Bingham was not eligible for benefits for the time period in question based on her testimony that she was not able or available to work until she was fully vaccinated, we have no need to reach these additional issues.

R994-405-101(1) of the Utah Administrative Code, which provides:

> (1) A separation is considered voluntary if the claimant was the moving party in ending the employment relationship. A voluntary separation includes leaving existing work, or failing to return to work after:
>
> > (a) an employer attached layoff . . . ,
> >
> > (b) a suspension, or
> >
> > (c) a period of absence initiated by the claimant.

Utah Admin. Code R994-405-101(1).

¶31 Based on the statute and the rule, we disagree with the Department's position. The statute specifically directs that it is applicable when a claimant "leaves work," Utah Code Ann. § 35A-4-405(1)(b), and the rule provides that a voluntary separation occurs when the claimant "leav[es] existing work," which includes "a period of absence initiated by the claimant," Utah Admin. Code R994-405-101(1). Here, from January 24 to May 15, Bingham was placed on a leave of absence—which clearly qualified as "a period of absence" under the rule—that she initiated in consultation with Employer when she expressed her fears of returning to work unvaccinated. Thus, by the plain terms of the rule and the statute, Bingham "left work" during her leave of absence, and the equity and good conscience standard of Utah Code section 35A-4-405(1)(b) is applicable to Bingham's case.

¶32 Nevertheless, Bingham's position—that it was contrary to equity and good conscience for the Board to deny her benefits— is unavailing. It was not contrary to equity and good conscience

for the Board to deny her benefits because Bingham returned to work without any apparent concern about contracting the virus when Employer reopened its store in August 2020. Bingham stopped working and re-applied for unemployment benefits only because she was furloughed when not enough customers came to the store. At this time, the pandemic was still raging with no end in sight, and a vaccine had not yet been approved and was not ready for use in the population, but Bingham still chose to return to work. Thus, Bingham cannot now complain that the Board's decision denying her benefits from January 24 to May 15 was contrary to equity and good conscience when she had previously demonstrated that she was willing to work in the face of the virus and stopped working only due to another furlough. Very simply, Bingham may not complain that the Board acted incorrectly in concluding that she was ineligible for benefits during the times she chose not to work out of her concern about the virus when the concern had previously not prevented her from working. Thus, the equity and good conscience rationale cannot be a basis to disturb the Board's decision.

## II. Fault

¶33    Bingham next contends that the Board abused its discretion in finding that the three elements of a fault overpayment were met, requiring her to remit the benefits she received from January to May. We disagree.

¶34    If a claimant "by reason of his own fault, has received any sum as benefits" to which "he has been found not entitled, he shall repay the sum." Utah Code Ann. § 35A-4-406(4)(b) (LexisNexis 2019). A claimant is at fault for an overpayment if knowledge, materiality, and control are established by a preponderance of the evidence. Utah Admin. Code R994-406-301(1). Materiality is established when "[b]enefits were paid to which the claimant was not entitled." *Id.* R994-406-301(1)(a). Control is established when the "[b]enefits were paid based on incorrect information or an

absence of information which the claimant reasonably could have provided." *Id.* R994-406-301(1)(b). And knowledge is established when "[t]he claimant had sufficient notice that the information might be reportable." *Id.* R994-406-301(1)(c).

¶35 Here, materiality is established because, as we have already discussed, Bingham received benefits from January 24 to May 15 that she was not entitled to given her leave of absence. Control is established because Bingham filed weekly claims for unemployment benefits without disclosing that she was on a leave of absence until she was fully vaccinated and was thus unable and unavailable for full time work. Bingham could have readily provided this information to the Department.

¶36 Finally, knowledge is established because Bingham received the claimant guide on two occasions—which she acknowledged—and was informed via the Department's online instructions regarding what was required for benefit eligibility. The claimant guide informed Bingham that she was required to "be physically and mentally able to work full-time" and stated,

> If you are ill, injured, on a leave of absence or unable to work for any other reason, you may not be eligible for benefits for that period of time. You are required to report that you are not available for work when any condition exists that could prevent you from working, accepting work, or seeking full-time work.

And the Department's weekly online application asked Bingham, "Were you able and available for full-time work without any restrictions?," and each time Bingham answered, "Yes."

¶37 The claimant guide and the online instructions clearly put Bingham on notice that she was required to be able and available to work to be eligible for benefits, and she was "thus accountable

for the information [therein]." *See Smith v. Department of Workforce Services*, 2010 UT App 382, ¶ 11, 245 P.3d 758 (quotation simplified). Accordingly, Bingham knew that she was not eligible for benefits because she was unable to work and unavailable for work from January 24 to May 15, due to her being unvaccinated, and yet she still applied for and received benefits in the face of these clear instructions. This evidence established that Bingham had knowledge of the incorrect overpayment.[8] *See Gourley v. Department of Workforce Services*, 2014 UT App 278, ¶ 9, 339 P.3d 952 (holding that the knowledge element was satisfied because the claimant was given the proper information in the online instructions and in the claimant guide); *Hasratian v. Department of Workforce Services*, 2013 UT App 79, ¶ 8, 300 P.3d 324 (holding that the knowledge element was satisfied because the claimant had received the claimant guide); *Frislie v. Department of Workforce Services*, 2011 UT App 114, ¶ 7, 256 P.3d 229 (per curiam) (same); *Konan v. Department of Workforce Services*, 2011 UT App 48, ¶ 5, 249 P.3d 567 (same).

¶38 Bingham resists this conclusion by asserting that she did not participate in the decision not to return to work and thus it cannot be held against her. In support, she points to the following part of her testimony during the hearing before the ALJ:

> [The ALJ]: Okay. And so then you decided it just wasn't worth working those hours because the COVID vaccine was right around the corner and it was dangerous to work in a public place?

---

8. Again, Bingham takes issue with the Board's characterization of her refusals to work in January and February as a basis for its fault determination. But once again, even if the Board erred in this regard, Bingham's fault is still established by the fact that she knew she was unavailable and unable to work and yet continued to apply for and receive benefits.

[Bingham]: . . . I did not decide that.

[The ALJ]: I thought that's what you told me.

[Bingham]: No, [the manager] and I discussed . . . it and mutually agreed that this is not a good time to come in for a few hours.

[The ALJ]: That's what I was asking.

[Bingham]: I'm so sorry. It just sounded a little bit different so I wanted to clarify that.

[The ALJ]: So . . . you all decided that it just wasn't worth working the four hours given the vaccine was right around the corner[?]

[Bingham]: The danger, the danger of it and for my age and the danger of it. She mutually agreed. . . . So we discussed it and mutually agreed.

This testimony does not support Bingham's assertion that it was Employer who decided she should not come in. In that testimony, Bingham informed the ALJ that they "mutually agreed" that she should not come in. This is a far cry from Employer deciding, over her objection, that she should not come to work. Thus, Bingham at the very least took part in the decision not to return to work until vaccinated, *see supra* ¶¶ 28–29, and this does not indicate that the Board's fault determination was an abuse of discretion.

¶39    For these reasons, we decline to set aside the Board's fault determination premised on its conclusion that the overpayment was the fault of Bingham.

III. Due Process

¶40    Bingham contends that her constitutional due process rights were violated in three ways. First, she contends her rights were violated because "the ALJ failed to give full deference to [her] hearing impairment." Second, she contends her rights were violated because the ALJ and the Board relied on inadmissible hearsay in making their decisions. Third, she argues that the Board violated her due process rights when it did not accept and consider her memorandum. These arguments are unavailing.

A.    Hearing Impairment

¶41    Bingham's primary argument is that her due process rights were violated because she should have been given an in-person hearing and when she was not given one, her testimony should have been supplemented with her declaration. "At a minimum, the right to due process requires that those with an interest in a proceeding be given notice and an opportunity to be heard in a meaningful manner before their interests are adjudicated by a court." *Salt Lake Legal Def. Ass'n v. Atherton*, 2011 UT 58, ¶ 2, 267 P.3d 227. Here, the only issue is whether Bingham received an opportunity to be heard in a meaningful manner. To be heard in a meaningful manner means that a party was given "an opportunity to present evidence and argument on that issue before decision." *Plumb v. State*, 809 P.2d 734, 743 (Utah 1990). Our review of the hearing leads us to conclude that Bingham did receive a meaningful opportunity to be heard, and thus her due process rights were not violated.

¶42    At the beginning of the hearing, the ALJ asked Bingham, "Are you having any trouble hearing me now?" Bingham responded, "I'm okay . . . it's understanding. I hear, it's the understanding. [Y]you did go fast but that's okay, I think I got pretty much all of it so . . . I think I'm ok at the moment, yes." The ALJ then told her to "be sure to stop me and tell me if there is

something that you don't understand or if you need me to repeat it," and he reemphasized that she should "feel free to interrupt me at any time" if she needed something re-explained. Bingham acknowledged this and thanked the ALJ. From our review of this interaction and the remainder of the hearing, it seems that Bingham was able to participate appropriately in the hearing, even given her hearing impairment, and that she was given ample opportunity to have things repeated if she could not hear them. And throughout the hearing, the ALJ asked many questions and Bingham, for the most part, seemed to respond appropriately without any apparent hearing issues. And in the few instances where she seemed confused, she was able to get clarification.

¶43   Nonetheless, Bingham points to instances when she expressed confusion, such as when the ALJ asked at one point if she had any questions, and she responded, "I'm not getting all the information but I'm getting an overall view. . . . So I'm hanging in there." But again, the ALJ seemed to be cognizant of Bingham's hearing impairment and was attempting to make sure she was hearing and understanding, and Bingham informed the ALJ that she was able to hear and understand. Bingham also points to other times when she seemed confused during the hearing. In these instances, however, she seemed more confused about the content being discussed, rather than being confused because she could not hear, which does not support Bingham's claim that her rights were violated because she could not adequately hear what was going on. Indeed, at the beginning of the hearing, Bingham even informed the ALJ that she was struggling with "understanding" the information, not with hearing it. Additionally, Bingham had an informal representative assisting her during the hearing, presumably to help compensate for her limited hearing. This representative also proffered exhibits provided by Bingham, and the ALJ accepted them.

¶44   Faced with the record before us showing that the ALJ was aware of Bingham's hearing impairment and worked hard to

make sure she was able to hear him, that Bingham was able to respond capably to the majority of the ALJ's questions, that Bingham often told the ALJ she was able to hear what was occurring, that Bingham had assistance at the hearing, and that Bingham was able to present evidence, we cannot say that she did not have a meaningful opportunity to be heard at the hearing. *See Atherton*, 2011 UT 58, ¶ 2; *Plumb*, 809 P.2d at 743. Thus, Bingham's due process rights were not violated on this ground.

¶45 Having correctly concluded that Bingham's due process rights were not violated by the telephonic format of the hearing, the Board did not err in declining to consider her request to supplement her testimony with an additional declaration when she had already been provided ample opportunity to testify at the hearing.[9]

B.      Inadmissible Hearsay

¶46 Bingham contends that certain information provided by the Department at the hearing before the ALJ was inadmissible hearsay because no representative from Employer or the Department was there to authenticate the information provided. Even if we agreed with Bingham that this information constituted inadmissible hearsay and that this presents a constitutional issue,

---

9. It is unlikely that the Board's acceptance of the declaration would have had any effect on its decision, given that in the declaration Bingham again stated that she and her manager "mutually considered it to be too dangerous for me to return to work until I had been fully vaccinated." Thus, even if the Board considered the declaration, it would not have affected the Board's ultimate decision because, as previously discussed, this concession that she and Employer "mutually" agreed to the leave of absence goes a long way in undercutting Bingham's claim for unemployment benefits.

Bingham still cannot prevail on her claim because she suffered no prejudice even under the higher constitutional error standard.

¶47    All parties agree that in order for any constitutional error to be harmless, it must be harmless beyond a reasonable doubt. While we are skeptical that the harmless-beyond-a-reasonable-doubt standard applies in this context, even if that standard applies, the Department would still have met its burden. "For us to hold a constitutional error harmless, it must be harmless beyond a reasonable doubt. In other words, the side which benefited by the error . . . must show beyond a reasonable doubt that the error did not contribute to the [result]." *State v. Young*, 853 P.2d 327, 359 (Utah 1993) (footnotes omitted). Here, the Department meets this burden, which may not be applicable in an administrative case in any event. It argues that "neither the ALJ nor the Board relied on the challenged document[s]" in coming to their decision to deny Bingham benefits. Rather, it contends that the decisions by the ALJ and the Board were primarily based on Bingham's testimony, which "amply supported" those decisions, making the allegedly inadmissible documents irrelevant. We agree.

¶48    As previously discussed, Bingham testified numerous times that she and Employer mutually decided that she would not return to work until she was fully vaccinated. Thus, Bingham's testimony alone provided ample evidence that she was unable to work and unavailable for work. And the Department has shown that any error in reviewing the complained-of documents was harmless beyond a reasonable doubt because the Board's decision to deny benefits would have been the same even if it did not consider those documents. *See id.*

C.    Memorandum

¶49    Bingham contends that the Board violated her due process rights by refusing to consider her belated memorandum, resulting

in her not receiving "a full and fair hearing." We disagree. Bingham's due process rights were not violated given that she was provided the *opportunity* to be heard but failed to ensure that her brief was received in a timely manner; the Board did nothing to infringe on that opportunity and is not required to ensure that claimants' documents arrive on time. *See State v. Hegbloom*, 2014 UT App 213, ¶ 13, 362 P.3d 921 (explaining that due process requires "adequate notice and an *opportunity* to be heard in a meaningful way," which is "the opportunity to present evidence and argument on that issue") (emphasis added) (quotation otherwise simplified). And Bingham cites nothing to support the proposition that an agency that declines to consider late briefing treads on the constitutional rights of the individual. Thus, Bingham's due process rights were not violated, because she had the opportunity to provide the Board with her memorandum but was remiss in ensuring that it arrived on time.

CONCLUSION

¶50 We decline to disturb the Board's decision denying unemployment benefits to Bingham from January 24, 2021, to May 15, 2021, because Bingham was unavailable or unable to work during that time. The Board also did not exceed its discretion in determining that Bingham was responsible for the overpayment, requiring her to remit the benefits she received. Finally, the Board did not violate Bingham's due process rights in not holding an in-person hearing, in considering allegedly inadmissible evidence, and in not considering Bingham's belated memorandum.

_____